**Billy Joe SHAW, Plaintiff–Appellant,**

v.

**DOW BRANDS, INC., Defendant–Appellee.**

**No. 92–2323.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1993.

Decided May 18, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied July 13, 1993.

---

Paul F. Henry (argued), Richard K. Kruger, Mary Susan Henry, Kruger & Henry, Metropolis, IL, for plaintiff-appellant.

Thomas F. Crosby, Winters, Brewster, Murphy, Crosby & Patchett, Marion, IL (argued), for defendant-appellee.

Before CUMMINGS and ROVNER, Circuit Judges, and SHADUR, Senior District Judge.[*]

CUMMINGS, Circuit Judge.

Billy Joe Shaw claims his lungs were permanently damaged when, on August 12, 1990, he·tried to clean his bathroom. Shaw mixed something called "X–14 Instant Mildew Stain Remover" with Dow Bathroom Cleaner, a product manufactured by defendant. Though he opened the windows, set the ceiling fan swirling and let the air conditioner blow, Shaw was twice overcome by the fumes. When an hour later he found it hard to breathe, Shaw went to a doctor and eventually was put in the hospital to treat a lung condition known as Bronchiolitis Obliterans, allegedly caused by exposure to toxic fumes.

Shaw sued a series of companies including Dow Brands, Inc. ("Dow Brands"), its parent and 100 percent owner, Dow Chemical Co. ("Dow Chemical"), along with the manufacturer of the X–14 mildew stain remover, Block Household Products Co. (which had dissolved and was not in existence when the complaint was filed), Block Drug Co. Inc. ("Block"), and the store that sold the stain remover, Wal–Mart. Shaw filed his suit in Massac County, Illinois; Dow Brands had it removed to federal court in the Southern District of Illinois. The district judge decided that Shaw's state law strict liability and negligence claims for failure to warn were pre-empted by the Federal Insecticide, Fungicide and Rodenticide Act, more commonly

---

[*] The Honorable Milton I. Shadur, Senior District Judge in the Northern District of Illinois, is sitting by designation.

and easily referred to as FIFRA, 7 U.S.C. § 136 et seq. Based on a recent Supreme Court decision, we affirm the district court's pre-emption finding. We also hold that Shaw is properly in federal court despite two vexing jurisdictional issues that, inexplicably, did not come up until we raised the matter with the parties just before oral argument.

■■ Plaintiff's first jurisdictional claim (when prodded by our order of December 29, 1992) is that the $50,000 jurisdictional minimum in a diversity case has not been met. 28 U.S.C. § 1332(b).[1] Any defect in the removal procedure, or the lack of subject matter jurisdiction, requires a remand. *In re Amoco Petroleum Additives Co.*, 964 F.2d 706, 708 (7th Cir.1992). Jurisdiction exists in a removal action if the case might have been brought in federal court to begin with. *Grubbs v. General Elec. Credit Corp.*, 405 U.S. 699, 702, 92 S.Ct. 1344, 1347, 31 L.Ed.2d 612 (1972). Normally, the federal court in a removal action determines the amount in controversy by merely looking at plaintiff's state court complaint, *Davenport v. Proctor & Gamble Mfg. Co.*, 241 F.2d 511, 513 (2d Cir.1957), along with the record as a whole. See *Oglesby v. RCA Corp.*, 752 F.2d 272, 275, 278 (7th Cir.1985). In Illinois, however, tort claimants may not specify exact damages in their complaint beyond a limit set by the local circuit court rule. ILL.REV.STAT. 735 ILCS 5/2–604. Thus Shaw's complaint, which in accordance with Illinois law and the local rule asked only for damages "in excess of $15,000" (R. 2 at 18), gives no hint whether the real amount in controversy is greater than $50,000, in which case we have subject matter jurisdiction, or between $15,000 and $50,000, in which case we don't.

Dow's petition for removal stated a good faith belief that the amount in controversy was greater than $50,000 (R. 1 at 2). Shaw not only didn't take issue with this claim but stated blithely in the jurisdictional statement of his opening brief to this Court, "This action is between citizens of different states and the amount in controversy exceeds Fifty Thousand Dollars ($50,000)" (plaintiff's brief at 1). But after we questioned the parties about this and other discrepancies between the state court complaint and the removed action, Shaw took up the jurisdictional issue with a vengeance; he now steadfastly maintains that his complaint is worth less than the $50,000 threshold. Thus at oral argument we had the privilege of witnessing a comic scene: plaintiff's personal injury lawyer protests up and down that his client's injuries are as minor and insignificant as can be, while attorneys for the manufacturer paint a sob story about how plaintiff's life has been wrecked.

■ As the dissent explains, a plaintiff is in the best position to know how much his claim is worth, and we deem a plaintiff's request for damages to have been made in good faith. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). Even this understates the law because, as Justice Holmes said, "the party who brings a suit is master to decide what law he will rely upon." *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913). It follows that a plaintiff may evade federal court by simply asking for less than the jurisdictional amount, *St. Paul*, 303 U.S. at 294, 58 S.Ct. at 592, so long as the plaintiff, should she prevail, isn't legally certain to recover more. *In re Shell Oil*, 966 F.2d 1130, 1131 (7th Cir.1992). Indeed, the burden rests on the defendant in a removal action to prove that the amount in controversy is sufficient. *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97, 42 S.Ct. 35, 37, 66 L.Ed. 144 (1921). Defendants seeking removal may meet that burden by a preponderance of the evidence, *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936), which we take to mean proof to a reasonable probability that jurisdiction exists.[2]

---

1. We reject Dow's perfunctory argument that FIFRA confers federal question jurisdiction.

2. *St. Paul* holds that when a plaintiff asserts federal jurisdiction, the defendant may challenge the amount in controversy, but the plaintiff's contentions will stand unless it appears to a legal certainty that the claim is actually worth less than the jurisdictional amount. 303 U.S. at 289, 58 S.Ct. at 590. This standard should not be confused, however, with what a defendant must prove to invoke jurisdiction in a removal action. A number of district courts in this circuit have

Permitting a plaintiff to dictate the forum is more difficult, however, when the plaintiff's complaint is necessarily ambiguous because of state law. A most absurd (and unsatisfactory) result would be to deny jurisdiction in each tort case from Illinois because the complaint filed in state court is unclear about the amount in controversy. Judge Shadur's answer is that, before the defendant seeks to remove a case, she should request the specific amount in controversy from the plaintiff by interrogatory. Illinois allows such interrogatories despite the generalized cap on damages claims in complaints. Thus before a case is ever removed it will be clear how much the plaintiff is requesting and the defendant may proceed accordingly. Judge Shadur's suggestion is eminently sensible and we recommend it to removal-minded defendants in Illinois. We stop short, however, of declaring that this is the only means by which a defendant can establish to a reasonable probability that jurisdiction exists.

Judge Shadur's solution also doesn't tell a federal court how to deal with cases that have already been removed, such as this one. We could punish Dow Brands for not figuring out that it should have fired off an interrogatory to Shaw before seeking removal, and remand the case to state court. But the interrogatory procedure in Illinois is optional, and if appellate judges are not mind readers, *Amoco Petroleum Additives*, 964 F.2d at 708–709, neither are litigants. See *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 549 (7th Cir.1992). We cannot expect Dow in this case to have divined from reading tea leaves that before seeking removal it had to pry a firm number out of Shaw by interrogatory. We recently discussed another alternative to simple remand: a stipulation by plaintiff after removal that if the case is remanded, he will not seek more than $50,000 in damages. *Shell Oil*, 966 F.2d at 1131–1132. We ultimately rejected the stipulation procedure in *Shell Oil* by writ of mandamus. 970 F.2d 355, 356 (7th Cir.1992) (per curiam). Stipulation is problematic because it conflicts with a legal maxim that jurisdiction depends on the situation at the time of removal, *St. Paul*, 303 U.S. at 293, 58 S.Ct. at 592; *In re Carter*, 618 F.2d 1093, 1101 (5th Cir.1980), certiorari denied, 450 U.S. 949, 101 S.Ct. 1410, 67 L.Ed.2d 378 (1981), and that once a case is successfully removed a plaintiff cannot do anything to defeat federal jurisdiction and force a remand. *St. Paul*, 303 U.S. at 294, 58 S.Ct. at 592; see *Kellam v. Keith*, 144 U.S. 568, 12 S.Ct. 922, 36 L.Ed. 544 (1892) (suggesting that basis for removal must exist both at time complaint is filed and at time of removal). It seems unfair to defendants if a plaintiff can simply wait to see if her case is removed and then, once it is, have it sent back to state court by agreeing to a stipulation that the amount in controversy will not surpass $49,999.

We need not decide whether such cases as a general matter should be remanded for more factfinding (to state or federal district court) because in this instance Shaw has already conceded that his claim is worth more than $50,000: by not contesting removal when the motion was originally made, and

held that the defendant must establish more than $50,000 in controversy to a "reasonable probability." See, *e.g., Johnson v. Core–Vent Corp.*, No. 90 C 613, 1990 WL 51253, 1990 U.S.Dist.Lexis 4225 (N.D.Ill.1990); *Robert Kulasik Assoc. v. CBS Boring & Machine Co., Inc.*, No. 90 C 0425, 1990 WL 65800, 1990 U.S.Dist.Lexis 5551 (N.D.Ill.1990); *Cole v. Freightliner Corp.*, No. 89–2170-O, 1991 WL 42163, 1991 U.S.Dist.Lexis 3408 (N.D.Ill.1991); *Montgomery v. Ford Motor Co.*, No. 90 C 2440, 1991 WL 2423, 1991 U.S.Dist.Lexis 282 (N.D.Ill. 1991). Others have suggested a more stringent test. See, *e.g., Navarro v. LTV Steel Co.*, 750 F.Supp. 928, 929 (N.D.Ill.1990) (requiring certainty); *Maki v. Keller Indus., Inc.*, 761 F.Supp. 66, 68 (N.D.Ill.1991) (high degree of probability not sufficient); *Navarro v. Subaru of Am. Operations Corp.*, 802 F.Supp. 191, 193–194 (N.D.Ill.1992) (certainty required). We think the Supreme Court dictated the proper standard in *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780: "If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof. And where they are not so challenged, the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the *party alleging jurisdiction justify his allegations by a preponderance of evidence.*" *Id.* at 189, 56 S.Ct. at 785 (emphasis added). We hold that the test set forth in *McNutt* is satisfied if a defendant in a removal action can show to a reasonable probability that more than $50,000 is in controversy.

by jurisdictional statements to this Court in his first brief. As noted, jurisdiction must exist at the time of removal, *St. Paul*, 303 U.S. at 293, 58 S.Ct. at 592, and once removal has been perfected plaintiffs may not manipulate the process to void the removal. As the Supreme Court has emphasized:

> If the plaintiff could, no matter how *bona fide* his original claim in the state court, reduce the amount of his demand to defeat federal jurisdiction the defendant's supposed statutory right of removal would be subject to the plaintiff's caprice. The claim, whether well or ill founded in fact, fixes the right of the defendant to remove, and the plaintiff ought not to be able to defeat that right and bring the cause back to the state court at his election.

*St. Paul*, 303 U.S. at 294, 58 S.Ct. at 592. The dissent suggests that we must trust Shaw's lawyer, who is in a superior position to know the value of his client's claim, because "[b]oth from oral argument and from [an] affidavit, it is [ ] clear that Shaw's lawyer is a knowledgeable practitioner in the personal injury field who knows all about his case * * * " (dissent at p. 21). But presumably Shaw's lawyer was as knowledgeable when he assured us in his opening brief that his client's claim was worth *more* than $50,-000 as when he later assured us that his client's case was worth *less* than $50,000. Again, according to the dissent, Shaw's counsel could not have filed suit in federal court to begin with without violating Rule 11 because he knew that his client's case could not equal the jurisdictional amount. But Shaw's lawyer also signed the brief that assured us jurisdiction was intact; it is indeed a wonder that he shouldn't be subject to sanctions for swearing one thing in one brief and then swearing the opposite thing in a subsequent affidavit after it became clear that telling a new story might benefit his client. If we were to permit Shaw to get away with this, we would be allowing him to manipulate defendants in the very manner that is prohibited by the rule in *St. Paul*: once removal is perfected, the plaintiff cannot suddenly decide that, after all, the amount in controversy is less than the jurisdictional amount so that the case must go shuttling back to state court.[3]

■■ Shaw's second jurisdictional argument is that removal is defective because not all defendants consented, which they must. *Chicago, Rock Island & Pac. Ry. Co. v. Martin*, 178 U.S. 245, 248, 20 S.Ct. 854, 855, 44 L.Ed. 1055 (1900). In this instance, Shaw filed suit against four defendants and only one, Dow Brands, signed the removal petition. A petition is considered defective if it fails to explain why the other defendants have not consented to removal. *Northern Ill. Gas Co. v. Airco Industrial Gases, a Division of Airco, Inc.*, 676 F.2d 270, 273 (7th Cir.1982). Dow Brands gave no such explanation; therefore, its petition was defective on its face, although neither the parties nor the district court raised the matter until our order shortly before oral argument. In the meantime, Dow Brands has submitted an affidavit that purports to explain the absence of Block, Wal–Mart and Dow Chemical. The affidavit raises two questions: should we allow this belated explanation, and is the explanation convincing?

Removal petitions may be freely amended for thirty days after a defendant receives a copy of the state court complaint, or is served, whichever comes first. 28 U.S.C. § 1446(b). Of course, the thirty days elapsed long ago in this case. Although the time limit is said to be strictly applied, *Northern Ill. Gas*, 676 F.2d at 273, the time limit is not jurisdictional, *Ryan v. State Bd. of Elections of the State of Ill.*, 661 F.2d 1130, 1134 (7th Cir.1981), and in fact amendments

---

3. After this opinion was sent to the printer, Judge Shadur located a recent decision from the Fifth Circuit that supposedly conflicts with our view of jurisdiction: *Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia S.A.*, 988 F.2d 559 (5th Cir.1993). In that case, however, the Fifth Circuit took pains to point out that the plaintiff never asserted his claim was worth more than $50,000 (unlike Shaw), and that the plaintiff objected to removal in a "timely" fashion (also unlike Shaw). Since our holding against Shaw is premised on his having conceded that more than $50,000 is in controversy, and there are no facts in *Asociacion Nacional* even remotely similar, we do not understand why this case is relevant and do not agree with the dissent's implication that the majority opinion somehow creates a conflict between the circuits.

to correct "defective allegations of jurisdiction" are permitted under 28 U.S.C. § 1653 at any time. "The question is whether [the petition for removal] was so defective as to be incurable." *Kinney v. Columbia Savings & Loan Ass'n*, 191 U.S. 78, 80, 24 S.Ct. 30, 31, 48 L.Ed. 103 (1903). In this determination the court may look at the entire record of state court proceedings. *Powers v. Chesapeake & Ohio Ry. Co.*, 169 U.S. 92, 101, 18 S.Ct. 264, 267, 42 L.Ed. 673 (1898). Here, Dow Brand's petition was plainly sloppy in not explaining what happened to the other defendants, but since the issue was not raised until the appellate stage, *McKay v. Boyd Constr. Co.*, 769 F.2d 1084, 1087 (5th Cir.1985) (party may waive right to challenge removal), and since the absence of the other defendants was justified—as we will explain shortly—we are not willing to punish Dow Brands for what is, after all, a technicality that doesn't go to the heart of jurisdiction.

■ Block was not served until January 21, 1992, or nearly a month after the removal petition was filed on December 23, 1991, so that its consent was not needed. *Richards v. Harper*, 864 F.2d 85, 87 (9th Cir.1988); *P.P. Farmers' Elevator Co. v. Farmers Elevator Mut. Ins. Co.*, 395 F.2d 546, 547–548 (7th Cir.1968). Similarly, Wal–Mart had been dismissed from the suit before removal. Since it was no longer subject to the jurisdiction of the state court, it could not be removed to federal court. 14A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3721 (1985). That leaves Dow Chemical, the parent and 100 percent owner of Dow Brands. Nominal or formal parties need not join in removal. *Ryan*, 661 F.2d at 1134. A defendant is nominal if there is no reasonable basis for predicting that it will be held liable. 14A WRIGHT, MILLER & COOPER § 3731 n. 10. It is unclear whether parent corporations are *per se* nominal parties. But in this case Dow Chemical had no connection with the manufacture, sale or distribution of Dow Bathroom Cleaner; it engaged in no independent alleged wrongdoing but was joined solely because of the acts of its subsidiary. In any event, counsel for Dow Brands has sworn in an affidavit—undisputed by Shaw—that it had obtained Shaw's agreement to dismiss

Dow Chemical voluntarily before removal and that, in any event, Dow Chemical consents to removal. Whether this dismissal actually occurred isn't obvious from the record, but one would think that the plaintiff would have noticed the disappearance of a defendant somewhere on the way to the appellate court. Again, Shaw seems not to have minded until we raised the issue; his own submissions to this Court are styled "Billy Joe Shaw, Plaintiff–Appellant, vs. Dow Brands, Inc., Defendant–Appellee"—no mention of Dow Chemical. In short, the agreement of Shaw to drop Dow Chemical, Dow Chemical's belated consent, the fact that Dow Chemical is probably nominal, and Shaw's acquiescence all combine to convince us the parent's missing signature on the removal petition does not defeat jurisdiction.

■ Turning at last to the substantive question, we must decide whether federal pre-emption of an area of regulation also prohibits state common law tort actions. The district judge found that because of FIFRA, the federal law in question, Shaw could not bring a damages action claiming that the label on Dow Bathroom Cleaner was defective because Congress alone may regulate the labels and warnings on such products. FIFRA, enacted in 1947, was originally intended as a licensing and labeling statute for pesticides. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991, 104 S.Ct. 2862, 2866, 81 L.Ed.2d 815 (1984). Amendments in 1972 strengthened the law, and it became a comprehensive regulation of the sale and use of pesticides and other chemicals including such products as bathroom cleaners. *Wisconsin Public Intervenor v. Mortier*, —— U.S. ——, ——, 111 S.Ct. 2476, 2480, 115 L.Ed.2d 532. (1991).

■ The Supremacy Clause, found at Article VI cl. 2 of the Constitution, proclaims that state laws which "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are invalid. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Whether a federal statute pre-empts state law turns on congressional intent. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137–138, 111 S.Ct. 478, 482, 112

L.Ed.2d 474 (1990). That intent may be explicit in the statute itself, *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); in this case it is, at least as far as labeling and packaging are concerned. The Act says flatly: "Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b). The Supreme Court recently noted the absolutist nature of FIFRA's pre-emption in the labeling and packaging context even as it held that FIFRA does not pre-empt generalized state regulation of pesticides. *Mortier*, —— U.S. at ——, 111 S.Ct. at 2486. Since the parties do not dispute that Congress has exclusive jurisdiction in labeling and packaging, the only question is: how exclusive is exclusive? Shaw maintains that there is still room for common law tort actions for defective labels.

Shaw's argument is appealing because, unlike federal regulations which firms are required to follow, common law duties may be simply ignored by defendants. See, *e.g.*, *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1540–1541 (D.C.Cir.1984), certiorari denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) (despite pre-emption under FIFRA, state may decide that manufacturer should bear the risk for compensating losses). Indeed, they are smart to do so if the cost of compensating victims is less than the cost of altering the behavior that gives rise to the suit. On the other hand, damages actions, just like regulatory mandates, cause companies to modify their economic decisions. It would be silly to pretend that federal lawmakers, seeking to occupy a whole field of regulation, wouldn't also be concerned about the distorting effects of tort actions.

In any event, Shaw's argument about common law actions evaporated last summer when the Supreme Court decided *Cipollone*

*v. Liggett Group, Inc.*, —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). That opinion held that sweeping congressional efforts to pre-empt state regulation also bar state damages claims. Although the Court said that "there is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common law damages actions," *id.* at ——, 112 S.Ct. at 2618, it also held that a broad statement in a federal law prohibiting state regulation does, in fact, wipe away common law attempts to impose liability on top of the federal regulation. *Id.* at —— –——, 112 S.Ct. at 2619–2621.

The federal laws at issue in *Cipollone* were the Federal Cigarette Labeling and Advertising Act ("1965 Cigarette Act") and the Public Health Cigarette Smoking Act of 1969 ("1969 Cigarette Act"), 15 U.S.C. §§ 1331–1340. These laws are responsible for, among other things, the surgeon general's warnings that grace the sides of cigarette packages. The pre-emption provision in the 1965 Cigarette Act was quite narrow and said, "No *statement* relating to smoking and health shall be required *in the advertising* of [properly labeled] cigarettes." *Id.* at ——, 112 S.Ct. at 2618. Congress' emphasis on the words "statement" and "advertising" led the Court to conclude that the 1965 Cigarette Act only pre-empted state and federal rules that might require additional warnings, but not state law damages actions. The 1969 Cigarette Act, however, was much broader; it barred not merely "statements" but any "requirement[s] or prohibition[s] * * * imposed under State law." *Id.* at ——, 112 S.Ct. at 2619. This language, the Court held, signalled legislative intent to ban common law tort actions along with direct state regulation.[4] As Justice Stevens wrote:

> The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the

---

4. This section of Justice Stevens' opinion was joined by only three other justices. Two others, however, advocated complete pre-emption based on the 1969 Act. *Cipollone*, —— U.S. at —— – ——, 112 S.Ct. at 2632–2634 (Scalia, J., concurring in the judgment in part and dissenting in

part). We take this concurrence/dissent coupled with Justice Stevens' opinion to constitute a majority for the proposition that such a sweeping pre-emption provision bars state damages claims.

371

form of common law rules. As we noted in another context, "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."

*Id.* at ——, 112 S.Ct. at 2620 (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959)).

In order to succeed in the wake of *Cipollone*, then, Shaw would have to show that FIFRA's pre-emption language is less sweeping than the language of the 1969 Cigarette Act. Yet we can discern no significant distinction at all—FIFRA says that "[s]uch State shall not impose * * * any requirements for labeling or packaging in addition to or different from those required * * *," while the cigarette law says "[n]o requirement[s] or prohibition[s] * * * imposed under State law" shall be permitted. Both seem equally emphatic: "[n]o requirements or prohibitions" is just another way of saying a "[s]tate shall not impose * * * any requirements." Not even the most dedicated hairsplitter could distinguish these statements. If common law actions cannot survive under the 1969 cigarette law, then common law actions for labeling and packaging defects cannot survive under FIFRA. The Tenth Circuit recently held the same thing. *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.*, 981 F.2d 1177, 1179 (10th Cir.1993) ("We believe also the prohibition of 'any' requirement is the functional equivalent of 'no' requirement. We see no difference between the operative effect of the two acts"). Because *Cipollone* destroyed whatever argument Shaw might have had about pre-emption, we are compelled to affirm the district court decision that FIFRA bars this action.

SHADUR, Senior District Judge, dissenting.

Judge Cummings has done an admirable job of explaining why the majority believes that the normal principles long ago taught by such cases as *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913) and *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938) should not give plaintiff Shaw and his counsel a second bite at the apple. Without question Shaw has no real call on our equitable conscience (except to the extent that the majority's holding affords him less than equal rights, a matter dealt with later in this opinion). And perhaps the goal of efficiency may be advanced by not sending Shaw back for what might well be a state judge's decision to dismiss his case on the substantive FIFRA preemption issue.[1]

But subject matter jurisdiction is not a matter of equity or of conscience or of efficiency. It is rather one of the lack of judicial *power* to decide a controversy. Both the Supreme Court as the ultimate authority and this court as its spokesperson have consistently announced that subject matter jurisdiction cannot be conferred or waived even by express consent (see, e.g., *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 556, 42 L.Ed.2d 532 (1975)) or conduct (see, e.g., *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)) or estoppel (see, e.g., *American Fire & Cas. Co. v. Finn*, 341 U.S. 6, 17–18, 71 S.Ct. 534, 541–542, 95 L.Ed. 702 (1951)). As 13 Charles Wright, Arthur Miller & Edward Cooper, *Federal Practice & Procedure: Jurisdiction 2d* § 3522, at 66–68 (2d ed. 1984) (footnotes and numerous citations omitted) has summarized those immutable principles:

> The general rule is that the parties cannot confer on a federal court jurisdiction that has not been vested in that court by the Constitution and Congress. This means

---

1. Incidentally, that issue is now pending before the Supreme Court on a petition for certiorari to the Nevada Supreme Court in *Davidson v. Velsicol Chemical Corp.*, 108 Nev. 591, 834 P.2d 931 (1992), *petition for cert. filed*, 61 U.S.L.W. 3634 (U.S. Mar. 1, 1993) [Editor's Note: since opinion was filed, cert. was denied —— U.S. ——, 113 S.Ct. 1944, 123 L.Ed.2d 650.] It is also my understanding that other petitions are on their way up in *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.*, 981 F.2d 1177 (10th Cir.1993) and *Papas v. Upjohn Co.*, 985 F.2d 516 (11th Cir.1993) (per curiam).

that the parties cannot waive lack of jurisdiction by express consent, or by conduct, or even by estoppel; the subject matter jurisdiction of the federal court is too basic a concern to the judicial system to be left to the whims and tactical concerns of the litigants.

And so it is that the opening boilerplate jurisdictional statement that Shaw's lawyer included at the outset of his initial brief in this court (quoted at page 3 of the majority opinion), a statement that was made before we brought the jurisdictional question to counsel's attention (as was our duty—see, among the host of cases so holding, *Mitchell*, 293 U.S. at 244, 55 S.Ct. at 165 ("An appellate court must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review"), cannot control here. Once Shaw's counsel was asked to address the matter specifically, he unequivocally negated the potential existence of the minimal jurisdictional amount. And he did so not in purely conclusory terms, but for a specific reason tied to his own knowledge of his client's actual damages and of the size of verdicts returned in the area where counsel practices. Appellate courts are not factfinders, and we are not really in a position to reject such an informed valuation on our own.

With regret, then, I am constrained to express my view that the majority opinion in this case has done violence (not purposefully, of course) to one or more of the most fundamental principles of federal jurisdiction. And what may perhaps be more regretful (though in jurisprudential terms, what can be more serious than the exercise of power that does not exist?) is that the infliction of such wounds is really not needed to protect the right of any defendant to remove a properly-removable case from the state to the federal court.

In our system of federalism, a plaintiff surely has just as great a right to bring and retain his, her or its action in a state court where federal jurisdiction is lacking as a defendant has to remove a state-filed case to a federal court where federal jurisdiction does exist.[2] It is no accident that it was in the course of deciding a subject matter jurisdictional question that Justice Holmes stated the now-famous aphorism in *The Fair*, 228 U.S. at 25, 33 S.Ct. at 411:

> Of course, the party who brings a suit is master to decide what law he will rely upon, and therefore does determine whether he will bring a "suit arising under" the patent or other law of the United States by his declaration or bill. That question cannot depend upon the answer, and accordingly jurisdiction cannot be conferred by the defense, even when anticipated and replied to in the bill.

That notion of the plaintiff, and *not* of the defendant, as "the master" of the choice of law upon which to sue is reinforced by the "powerful doctrine" (*Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983)) of the "well-pleaded complaint" rule that originated in such cases as *Louisville & N.R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908) and that was discussed at length in *Franchise Tax Bd.* itself.

In the context of removal jurisdiction, two refinements have been added that really reinforce the seminal doctrines announced in *The Fair* and in the "well-pleaded complaint" cases. One of those refinements is what has come to be known as the "artful pleader" doctrine, in which a state court plaintiff may not simply omit from the complaint the *words* that would expressly call federal questions into play, in an effort to escape the reality that the plaintiff's lawsuit necessarily implicates federal questions (see, e.g., *Feder-*

---

**2.** At the outset of his 1992 year-end report on the federal judiciary, Chief Justice William Rehnquist repeated his 1991 view on "how best to use and administer the limited resource that is the federal judiciary":

> Thus, for example, my last year's report was cautionary. I noted the commencement of the federal judiciary's long-range planning effort

and urged that it include serious reexamination of the role federal courts should play in our nationwide system of justice. I cautioned against substantial rejection of traditional concepts of federalism and advocated a vision of the federal courts as distinctive forums of limited jurisdiction, meant to complement state courts rather than supplant them.

*ated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981), quoting the "artful pleading" phrase from what is now (in the current edition) 14A Wright, Miller & Cooper § 3722, at 266 (2d ed. 1985)). And the other is the situation under which "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character" (*Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987))—a concept that the Supreme Court has applied only to the "unique pre-emptive force of ERISA" (*id.* at 65) and, before that, to "the pre-emptive force of § 301 [of the LMRA, which] is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization' " (*Franchise Tax Bd.*, 463 U.S. at 23, 103 S.Ct. at 2853, speaking of *Avco Corp. v. Machinists*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968)).

On that score, it should be noted before turning to the major issue here that Dow Brands' late-tendered assertion that a comparable field preemption has been created by FIFRA is wholly without foundation. Even while the Supreme Court announced its exceptional and narrowly-circumscribed holding in *Metropolitan Life*, the Court there reconfirmed the teaching of *Louisville & N.R. Co. v. Mottley* and *Gully v. First National Bank*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936) as establishing the universal rule that governs in the absence of the special statutory language and legislative history that has led to the unique treatment of LMRA and ERISA (481 U.S. at 63, 107 S.Ct. at 1546):

> Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court.

That scotches any argument of federal-question jurisdiction based on notions of federal preemption in this case, for there is no way in which FIFRA approaches—let alone matches—the "powerful" and "unique" preemptive status of LMRA § 301 or ERISA.

Those basic principles of the boundaries of federal and state judicial power, and of the litigants' rights to control which power they may properly call into play, apply with equal force to diversity jurisdiction. There too the burden is on the party that seeks to invoke federal jurisdiction to establish its existence. When a suit is originally filed in federal court, that burden is plaintiff's. And to forestall the unwarranted entry of any plaintiff into the federal court, the plaintiff's burden is not automatically satisfied by simply *saying* that more than $50,000 is in controversy [3]—instead there must be a colorable basis for that assertion. In that respect still another seminal—and still the leading—decision, *St. Paul Mercury Indemnity*, 303 U.S. at 288–89, 58 S.Ct. at 590 (footnotes omitted), teaches:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim. But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

On the other hand, where the plaintiff has originally gone into a state court and defen-

---

**3.** Throughout this discussion it will be assumed that diversity of citizenship is shown by the complaint or (in the case of removal) by the notice of removal, and that no flaws such as those referred to in *America's Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1074 (7th Cir.1992) (per curiam) exist to defeat federal jurisdiction.

dant then seeks to remove to the federal court, the burden of establishing the existence of federal jurisdiction becomes defendant's. Once again the burden is not satisfied by defendant's merely pointing to plaintiff's boxcar ad damnum. If that ad damnum is not colorable, so that it is plain that the requisite jurisdictional amount is not in controversy, the attempted removal does not confer federal jurisdiction—something that results in the loser's ability to force the parties back to square one in the state court, even post-judgment and even on appeal (*Ross v. Inter–Ocean Ins. Co.*, 693 F.2d 659, 663 (7th Cir.1982)).

In still another variant on the scenario, if a plaintiff deliberately seeks to recover less than the jurisdictional amount, *The Fair*'s ·concept of the plaintiff's mastery of the complaint precludes the defendant from bringing the case into federal court by saying that the plaintiff *could* have tried to obtain a larger recovery. Thus a plaintiff may simply choose to sue in the state court for less than the federal jurisdictional amount and be assured of the protection of his, her or its right to remain there. *St. Paul Mercury Indemnity*, 303 U.S. at 294, 58 S.Ct. at 593 has put the matter succinctly and unequivocally:

If he [the plaintiff] does not desire to try his case in the federal court he may resort to the expedient of suing for less than the jurisdictional amount, and though he would be justly entitled to more, the defendant cannot remove.

All of those principles, because their nature is to define the presence or absence of subject matter jurisdiction, cannot of course be bent or broken. It remains only to discuss the application of those principles in the situation when, as here, a plaintiff is forbidden by state law to state a specific ad damnum in the complaint.

Illinois' Code of Civil Procedure, like corresponding legislation in some other states, includes this provision (Ill.Rev.Stat. ch. 110, ¶ 2–604, redesignated as of January 1, 1993 as 735 ILCS 5/2–604 ("Section 2–604")):

Every complaint and counterclaim shall contain specific prayers for the relief to which the pleader deems himself or herself entitled except that in actions for injury to the person, no ad damnum may be pleaded except to the minimum extent necessary to comply with the circuit rules of assignment where the claim is filed.... In actions for injury to the person, any complaint filed which contains an ad damnum, except to the minimum extent ʼnecessary to comply with the circuit rules of assignment where the claim is filed, shall be dismissed without prejudice forthwith upon motion of a defendant or upon the court's own motion.

Under the compulsion of that statutory mandate, all that Shaw's lawyer was able to include in each count of his Complaint was that defendants' conduct was "to the damage of Plaintiff in sums of money in excess of $15,000."

Under those circumstances, by definition the defendant who is confronted with such a claim cannot tell—except by sheer surmise—the amount in controversy: Is it more than $15,000 but not more than $50,000 (so that there is no federal jurisdiction), or is it more than $50,000 (so that such jurisdiction exists)? And remember that such a statute expressly forbids the plaintiff's exercise of the *right* that is just as expressly granted to him or her by *St. Paul Mercury Indemnity*: the ability to sue for a specific amount less than the threshold jurisdictional level and thereby to be assured of staying in the state court.

But the selfsame statute that creates the plaintiff's dilemma in that respect (at least under the majority's analysis) also provides the solution for preserving, unimpaired, a defendant's right of removal where it truly exists. Here is how that statute concludes:

Nothing in this Section shall be construed as prohibiting the defendant from requesting of the plaintiff by interrogatory the amount of damages which will be sought.

And counsel for Shaw, when the issue was posed in the course of oral argument, confirmed the regular availability and use by practicing lawyers of that opportunity to obtain information about the real-world nature of a plaintiff's claim (a practice so prevalent that we might well take judicial notice of it, although that approach is needless given the record here).

This case really epitomizes the inappropriateness, in jurisdictional terms, of permitting any case to be removed from a state to a federal court based on the amorphous guess of a defense lawyer. Complaints in personal injury cases regularly repeat a formulaic recital of the assertedly grievous harms suffered by plaintiffs, without giving a clue as to how much is *really* in controversy. When before oral argument in this case we posed to the parties the jurisdictional issue that the parties had not addressed in their original briefs, Shaw's experienced counsel filed an affidavit in which he swore that he had evaluated his client's case (one in which there were no permanent injuries) and the level of verdicts in the economically depressed area where the case was brought, and that he had concluded that the federal jurisdictional amount was *not* in controversy. Here is paragraph 5 of his affidavit (emphasis in original):

> 5. Affiant is familiar with the medical records and bills relating to Plaintiff's claimed injury. Affiant is also cognizant of Plaintiff's medical condition prior to the alleged injury. Affiant is familiar with verdicts and settlements of personal injury lawsuits in the region and area of the original venue of this case (Massac County, Illinois).[4] Based upon all relevant considerations, Affiant believes that verdict in this case in its original and proper venue would *not* exceed $50,000.

Both from oral argument and from that affidavit, it is thus clear that Shaw's lawyer is a knowledgeable practitioner in the personal injury field who knows all about his case—the extent of his client's injuries, the fact that his client is fully recovered, and the effect of the locale of the action on the size of jury verdicts. In light of his sworn belief, he could not have filed suit in the federal district court without actually violating both the subjective and the objective branches of Fed.

R.Civ.P. 11.[5] And our decisions in *In re Amoco Petroleum Additives Co.*, 964 F.2d 706 (7th Cir.1992) and *In re Shell Oil Co.*, 970 F.2d 355 (7th Cir.1992) (per curiam) (which carry forward the teaching of *St. Paul Mercury Indemnity*, 303 U.S. at 289–90, 58 S.Ct. at 590–91 in that respect) mean that if defense counsel were nevertheless permitted to remove the case to federal court, Shaw's counsel could not then, by post-removal filings that would set out his acknowledgement that the verdict if he won the case would not exceed $50,000, cause the case to be sent back to the state court—the place where it belongs because federal jurisdiction is assuredly lacking.

On the other side of the controversy, Dow's lawyer—who under the majority's view of 28 U.S.C. § 1446(b) ("Section 1446(b)") had to act to remove within 30 days after receiving the complaint, on pain of losing the right to remove—filed his notice of removal at a time that he knew nothing about the case except for the recitals in the Complaint (and was particularly unaware of plaintiff's current condition). As the now-claimed predicate for that removal, defense counsel has tendered to us (although he never submitted to the district court) excerpts from a jury verdict reporter, reflecting that some juries in some other places around the country—dealing with wholly different facts—have delivered verdicts of over $50,000 (sometimes many times over that, where extremely serious permanent injuries are involved).

To permit removal under those circumstances turns jurisdiction on its head. If the majority view were correct, we would have a situation in which a federal court is *without* jurisdiction at the behest of the plaintiff (who knows the facts) but *has* jurisdiction at the behest of the defendant (who does not). It

---

**4.** Massac County is at the very southeastern tip of the State of Illinois. Its county seat, Metropolis, has a population of some 7,000. In the federal Southern District of Illinois, cases from that county are heard in its Benton Division (as was true here).

**5.** At page 368 the majority suggests that Shaw's counsel ought to be subject to sanctions for his

"more than $50,000" jurisdictional statement in his opening brief before us. This court of course takes seriously the obligations of every lawyer to be candid. But a lawyer's mistaken view of subject matter jurisdiction has never inhibited this court (or any other) from applying the correct rule—hence the doctrine rejecting waiver, consent and estoppel in this area of the law.

takes no more than a statement of that proposition to demonstrate its unacceptability.

If a defendant is not driven by the majority-announced rule, the answer is easy. Any defendant who has not received a demand from plaintiff before suit is filed [6] and who is then confronted with the indefinite "more than $15,000" recital in a complaint such as Shaw's, and who is therefore unable to know whether plaintiff is really seeking more than $50,000 (so that the 30–day clock of Section 1446(b) has not begun to tick), need only direct a few well-chosen interrogatories to plaintiff as specifically authorized by the last sentence of Section 2–604. For example:

1. State the amount of the damages actually being sought in this action.

2. State whether you are prepared to agree that the damage award will in no event exceed $50,000.[7]

If both of those answers reflect a commitment on plaintiff's part that no more than $50,000 is in controversy, it must follow under the teaching of *St. Paul Mercury Indemnity* that defendant has no right to remove the case (and plaintiff and defendant are thus placed on an equal footing in federal jurisdictional terms, as must be the case). But if plaintiff is unwilling to commit to the limitation requested in the second interrogatory, defendant then knows that plaintiff has acknowledged that more than $50,000 may be in dispute. And if defendant has the kind of information to support a good faith belief to the same effect, defendant then has the full 30–day period within which to remove the case, for only then does the time clock begin

to run under the express provisions of Section 1446(b):

If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.[8]

All of this has seemed so self-evident to me that I fear that my earlier rulings (issued while wearing my more accustomed robe as a district judge), which consistently require such a showing by defendant as a predicate for removal, may have been more cryptic than they should have been (see, e.g., *Navarro v. LTV Steel Co.*, 750 F.Supp. 928 (N.D.Ill. 1990); *Maki v. Keller, Inc.*, 761 F.Supp. 66 (N.D.Ill.1991)). But the same principles appear equally self-evident to the Court of Appeals for the Ninth Circuit. Confronted with the identical problem some months ago (for Nevada has a statute similar to the provision in the Illinois Code of Civil Procedure), that court swiftly dispatched a defendant's removal as ill-founded in a per curiam opinion grounded squarely on *St. Paul Mercury Indemnity* and on the principles that have been set forth at greater length here (*Gaus v. Miles, Inc.*, 980 F.2d 564 (9th Cir.1992) (per curiam)).

And what I have set out in this analysis is also squarely supported by the views of the

---

**6.** If such a demand has been received and the amount sought is $50,000 or less, by definition there is no right to remove. Conversely, if the demand is for more than $50,000 and defendant has no good faith basis for viewing the demand as wholly unrealistic, by definition the right to remove exists at the outset of the litigation.

**7.** It is worth noting parenthetically that before Section 2–604 forbade the inclusion of a specific ad damnum, when it was the consistent practice to include such a specific prayer in every complaint, early Illinois case law "held that an instruction on the question of damages is objectionable unless it confines the jury to such damages as are claimed in the complaint and shown to be the proximate result of defendant's negli-

gence, and a failure so to limit the jury has been held to be reversible error" (15 I.L.P. *Damages* § 272 (1968) and cases cited there). What has been set out in the text is effectively the interrogatory counterpart, as expressly contemplated by Section 2–604 that earlier case law. It should be emphasized, though, that nothing in the analysis here hinges on whether that earlier case law remains viable under the current Illinois statute.

**8.** No jeopardy is created for a defendant by that last clause's one-year limitation, which was added by the 1988 amendment to Section 1446(b). Defendant is free to transmit the appropriate interrogatories to plaintiff at the very outset of the case in the state court.

judges on *both* sides of the dispute that had divided the Court of Appeals for the Fifth Circuit in the now vacated decision in *Kliebert v. Upjohn Co.*, 915 F.2d 142 (5th Cir. 1990).[9] To the original *Kliebert* majority, the precise kind of showing that has been offered here by Dow Brands—a defendant's generalized presentation of damage awards that had been obtained in other cases, with no showing of their comparability to plaintiff's case—could not be permitted to override the plaintiff's counsel's evaluation of his own case. Hence the majority had ordered that the case be remanded as having been removed without jurisdiction (*id.* at 146–47). To dissenting Judge Jolly, that conclusion was wrong because it is impermissible to apply differing standards to plaintiffs and defendants in determining a case's removability (*id.* at 147). But what I have outlined here meets the concerns of *both* the majority and dissent in *Kliebert*, for it actually provides a level playing field for the litigants (Judge Jolly's concern) while at the same time preserving the integrity of both federal and state jurisdiction. By sharp contrast, what the majority does here is at odds with *both* the *Kliebert* majority and the dissent, for it is directly opposed to the majority view and it also conflicts directly with Judge Jolly's view of equal justice by conferring greater rights on the less-informed defendant than on the better-informed plaintiff.

Finally, in one of the instances of serendipity that mark the judicial process with surprising frequency, an April 15, 1993 opinion from the Fifth Circuit (*Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia S.A.*, 988 F.2d 559 (5th Cir. 1993)) has come to my attention just as this opinion was literally at the printer. There the Fifth Circuit required the remand of a removed case under circumstances much akin to those involved here.[10] Although it is of course possible to say that there are some factual distinctions between that case and this one (something that is *always* possible, see Edward Levi, *Introduction to Legal Reasoning* ), the lesson that the Fifth Circuit teaches there is clearly consistent with the position that is urged here, while it does not fit comfortably (if at all) with the position taken in the majority opinion in our case. Certainly neither the initial conclusory jurisdictional statement in Shaw's brief nor Dow's generalized assertions later tendered to us, both so squarely at odds with the particularized sworn statement that Shaw's lawyer has provided to us negating the jurisdictional amount, would pass muster under the Fifth Circuit's analysis.

Having said all of this, I repeat that it is not difficult to understand the majority's lack of sympathy with the effort of Shaw and his attorney to attack subject matter jurisdiction where they have nothing to lose and possibly something to gain—in this instance they would have the opportunity to persuade another court (a state court) to take a different tack on the substantive question of FIFRA preemption. But with all respect, that is not at all unusual where subject matter jurisdiction is at issue. Thus the Supreme Court in *American Fire & Cas. Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951) allowed defendants who had removed the case to federal court, and had then successfully resisted plaintiff's attempts to remand the case (*id.* at 7–8, 71 S.Ct. at 537), to raise—and to win on—the absence of subject matter jurisdiction *after* plaintiff had obtained a verdict at trial (*id.* at 16–18, 71 S.Ct. at 541–542; and see 13 Wright, Miller & Cooper § 3522, at 68 n. 10 for numerous cases to the identical effect). Given the Supreme Court's adherence to that principle in a case that evokes far less sympathy for the party that challenges federal jurisdiction post-removal, the solicitude of the majority here for Dow's perceived dilemma pales by comparison.

What is ultimately troublesome in light of the difficulties that the majority finds with my suggested approach—despite the fact that the opinion finds that suggestion to be "eminently sensible" and "recommend[s] it to

---

9. En banc rehearing had been granted in *Kliebert* (923 F.2d 47 (5th Cir.1991) when the litigants then settled the case (947 F.2d 736 (5th Cir. 1991)).

10. Even more startlingly, the removing defendants in that case were Dow Chemical and one of its other subsidiaries, a Colombian corporation!

removal-minded defendants in Illinois"—is that the majority does not adopt a stance that would meet its concerns for Dow in this specific case while at the same time assuring a level playing field in all future removal cases: Why not announce a *prospective* rule, to control the subject matter jurisdictional determinations in all such future cases, under which the removing diversity defendant *must* submit to the district court either (1) a showing of the plaintiff's dollar demand (something that in my experience happens in almost all cases before suit is filed) or (2) the result of a quantifying interrogatory to plaintiff—with either of those showings to serve as a precondition to the establishment of the amount in controversy and hence as a precondition to removal? After all, this question of the jurisdictional amount is a regularly recurring problem, one that is presented in *every* Illinois-based diversity personal injury case because of the state law prohibiting a specific ad damnum in the complaint. Such a rule would promote every legitimate identifiable interest while prejudicing no one:

1. For defendants, every element of uncertainty would be eliminated. Because of Illinois' statutorily mandated ambiguity as to the amount at issue, the 30–day time clock for removal would not begin to tick until plaintiff has committed himself or herself to a real-world identification of the amount in controversy. When a plaintiff either specifies his or her demand or refuses to acknowledge that it is not over $50,-000, the 30 days allowed for removal will begin under 28 U.S.C. § 1446(b), and the standard identified at footnote 2 of the majority opinion could apply.

2. For plaintiffs, there is no risk of being thrust improperly into federal court where no more than $50,000 is really at stake—a result that is at odds with *The Fair* and *St. Paul Mercury Indemnity* (among other cases). As the majority opinion correctly points out at pages 367 and 368, once the case is actually lodged in the federal court it is too late for the plaintiff to correct the record (*Shell Oil*

strongly implies that). Again in realistic terms, a plaintiff's lawyer will rarely (if ever) give up a client's potentially larger recovery just to escape the perceived perils of a federal court—Shaw's situation is the extraordinary exception, because at the point that he came before us he had nothing to lose and possibly something to gain by going back to the state court for a second chance. And as this opinion has already pointed out, it is really unfair to deprive any plaintiff of a *legitimate* entitlement to conduct his or her lawsuit in the state court—a right that is just as important as either party's right to litigate in the federal court if we do have jurisdiction.

3. Importantly, the kind of procedure suggested here would be helpful to the district courts. It would establish a bright-line rule that would eliminate all questions of timeliness of removal and all (or nearly all) potential disputes about the amount in controversy. It would also tend to lessen any risk of our taking a case on removal, only to discover later on that jurisdiction was lacking—thus forcing the litigants to begin afresh in the state court.

Unfortunately the very fact that makes removal improper in this case—the comparatively small amount that is at stake—renders it unlikely that plaintiff's counsel can carry the case farther. And it would take a brave lawyer indeed to file the same lawsuit again in a state court and ask it to ignore as a nullity this court's ruling as having been rendered without jurisdiction. So the practical result is that the majority's action has sanctioned the creation of federal jurisdiction where it does not exist. I respectfully dissent.[11]

11. In light of my views on the absence of jurisdiction, I believe that it would be inappropriate for me to deal with the substantive FIFRA question. Accordingly, my silence on that subject should not be mistaken for an indication that I dissent from the majority's resolution of that issue as well.